John G. Balestriere*
john.balestriere@balestrierefariello.com
Matthew W. Schmidt, Bar No. 302776
matthew.schmidt@balestrierefariello.com
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone: (212) 374-5401
Facsimile:   (212) 208-2613

*Attorneys for Plaintiff*
*\*Pro Hac Vice Application Forthcoming*

Joseph A. Ferrucci, Bar No. 186287
jferrucci@oc-litigation.com
**FERRUCCI LAW GROUP, APC**
24361 El Toro Road, Ste. 220
Laguna Woods, CA 92637
Telephone: (949) 600-5370
Facsimile:   (949) 600-5371

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| **EMMA LOMAN, an individual,** | Case No.: |
| Plaintiff, | |
| – against – | **CIVIL COMPLAINT FOR DAMAGES** |
| **HARVEY WEINSTEIN, an individual,** | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Emma Loman ("Loman" or "Plaintiff"), by her attorneys Balestriere Fariello for her Complaint against Harvey Weinstein ("Weinstein" or "Defendant") respectfully alleges as follows upon information and belief, except as to allegations concerning Plaintiff, which are made upon personal knowledge, and except as otherwise indicated herein.

## PRELIMINARY STATEMENT

1.     Plaintiff Loman brings this suit to seek redress from Defendant Weinstein for raping her in a hotel room then threatening her into silence.

2.     In 2006, Weinstein—at the time a legendarily hot-tempered and powerful film producer—used his status, which arose from his many connections within Los Angeles and its world-dominating film industry, to lure Loman to his personal hotel room at the 59th Cannes Film Festival (the "Festival"), where he then forced himself on her.

3.     Loman first met Weinstein in 2004 at the Venice Film Festival, where they happened to attend the same dinner. While Loman's interactions with Weinstein at the dinner consisted only of short, friendly conversations, Weinstein offered to exchange contact information, and Loman agreed.

4.     Weinstein's actions appear to have been carefully planned well in advance of the Festival. After they exchanged information in 2004, Weinstein did not contact Loman, who at the time was a successful model and was starting to transition to an acting career, until before the Festival in 2006 to tell her that he was impressed with her as an actor. Weinstein asked Loman to come to the Festival as his guest to discuss her appearing in one of Weinstein's films.

5.     While Loman was initially wary, she had appeared in several films and knew that it was not uncommon for producers to contact actors with relatively young careers in this way. This was especially true of Weinstein, who

both wielded tremendous influence in the film industry and specialized in relatively low-budget, often critically acclaimed films that could provide an ideal opportunity for a lesser-known actor.

6. At the time, while Weinstein was known as demanding, the sexual abuse allegations against him were not yet widely known. Instead, he had just left Miramax, LLC ("Miramax"), a highly successful and influential movie production and distribution company that he had founded nearly 30 years earlier with his brother, Robert "Bob" Weinstein, to start a new venture, The Weinstein Company LLC ("TWC").

7. Weinstein was persistent. When Loman expressed hesitation at Weinstein's offer to be his guest at the Festival—in part because she was planning to attend the Festival with a personal friend at the time—Weinstein had his assistant call her repeatedly, up to 30 times a day, and told her that it would be important for him and TWC that she attend the Festival as his guest so that they could discuss her acting career.

8. Flattered at what she believed to be Weinstein's professional praise and recognizing a significant opportunity for her acting career, Loman agreed to attend the Festival as his guest. Weinstein had TWC arrange and pay for Loman to fly to the Festival and to stay in a luxury suite during her time there.

9. Loman's concerns were further abated once she met Weinstein at the Festival. Weinstein presented as charming and friendly and praised Loman's acting work.

10. Over the course of several more informal encounters at the Festival, Weinstein provided Loman with professional advice and support, gradually gaining her trust. Weinstein further lowered Loman's guard when he introduced her to a number of prominent members of the film industry near the beginning of the Festival.

11.   After several such informal meetings, Weinstein told Loman that he had multiple parts in upcoming TWC films that could be appropriate for Loman. Weinstein confided that the scripts for these films were highly confidential, so any substantive discussion of them would need to take place at Weinstein's "office."

12.   Weinstein's "office" was in fact his personal hotel suite, but Loman knew that film executives often used suites at prestigious hotels as offices due to lack of a more formal space, and to demonstrate their status in the industry. Loman also believed that she had built a rapport with Weinstein and could trust him.

13.   Upon arriving at Weinstein's suite, however, Weinstein quickly dropped his professional demeanor. He instead overpowered Loman and raped her.

14.   Shocked and betrayed, Loman did not know what to do.

15.   Furthering Loman's disorientation, Weinstein proceeded to treat the rape like a standard component of their business, as if the professional discussion he offered Loman had actually taken place. Immediately after raping Loman, Weinstein told her that he would follow up with a call, and although Loman wanted to make clear to Weinstein again that he had just severely violated her, he quickly made her leave his suite, citing his busy schedule. Weinstein later did follow up with a call to discuss an upcoming film premiere that would normally be an invaluable networking event for Loman's young acting career.

16.   At a later date, Weinstein physically cornered Loman in his suite that he had lured her into, and informed her that—even if she could somehow overpower the much larger Weinstein—the security guards that Weinstein

employed would not allow Loman to leave the floor until she promised to keep silent regarding Weinstein's assault and rape.

17.   The following year, when Loman was visiting Los Angeles to shop a film that she had been cast in, Weinstein sent another pointed reminder of both his power and his memory. He had TWC purchase the film Loman had been cast in—solely because Loman had been cast in the film—and then unilaterally had Loman fired from its cast.

18.   Fearful both that no one would believe her and the potential retaliation from such a powerful figure, Loman stayed silent. It was only upon the late 2017 revelation of the scope of Weinstein's wrongful actions—to both Loman and the general public—that Loman felt safe coming forward to seek redress for Weinstein's rape of her, which she began pursuing immediately.

### JURISDICTION AND VENUE

19.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), as there exists complete diversity of citizenship between Plaintiff and Defendant, and as the amount in controversy exceeds $75,000.

20.   This Court also has subject matter jurisdiction pursuant to 18 U.S.C. § 1595, which provides the district courts of the United States jurisdiction over violations of 18 U.S.C. § 1591.

21.   This Court also has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367(a), as those claims form part of the same case or controversy as the related federal claims over which this Court has original jurisdiction.

22.   This Court has personal jurisdiction over Weinstein because Weinstein has substantial, continual, and systematic contacts with this District, such that he is essentially at home in this District. Weinstein's wrongdoing at issue also arises out his specific conduct within this District.

1    23.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as a

2    substantial part of the events giving rise to the claims took place in this District.

3                                              **PARTIES**

4    24.    Plaintiff Emma Loman is a citizen and resident of Germany, who has

5    worked as an actor, producer, and model since 2004.

6    25.    Defendant Harvey Weinstein is a U.S. citizen who resides in

7    Westport, Connecticut. Weinstein was a Director and Co-Chairman of TWC

8    during the entirety of the events relevant to this action. Weinstein used his

9    status at TWC—one of the most prominent existing film production companies

10   during the relevant period—to rape Loman with impunity and threaten her

11   into silence.

12                                    **STATEMENT OF FACTS**

13                                           **Background**

14   26.    Weinstein's connection with the film industry began in the 1970s,

15   when he began operating the Century Theatre in Buffalo, New York.

16   27.    A few years later, he and his brother Bob sold their interest in the

17   theatre and used the proceeds to start Miramax in 1979.

18   28.    In 1989, fresh off the success of the film *Sex, Lies, and Videotape*,

19   Miramax opened its second office, in Los Angeles. The company subsequently

20   ran into financial difficulties, and in 1993 was acquired by The Walt Disney

21   Company ("Disney"), based in Burbank, California.

22   29.    Now both flush with cash from its new corporate parent and with

23   far greater commercial reach due to distribution through Disney's powerful

24   film distributor subsidiary, Buena Vista Pictures Distribution, Inc. (also based

25   in Burbank), Miramax went on to achieve massive success, propelling

26   Weinstein to a new status as one of the world's most famous and powerful film

27   moguls.

28

30.    In the decade following its acquisition by Disney, Miramax released such massive hits as *Pulp Fiction*, *Clerks*, *The English Patient*, *Scream*, *Good Will Hunting*, *Jackie Brown*, *Shakespeare in Love*, *The Cider House Rules*, and *Gangs of New York*.

31.    Weinstein also built much of his success on his ability to gain Academy Awards (or "Oscars"), prestigious awards hosted annually in Los Angeles by the Academy of Motion Picture Arts and Sciences (the "Academy"), also based in Los Angeles. Weinstein's films were nominated for a collective 341 Oscars, winning 81. Weinstein himself was nominated twice, and personally won the highly prestigious award for Best Picture in 1999 for his role as a producer of *Shakespeare in Love*. On October 14, 2017, Weinstein was removed from the academy due to the allegations against him being made public.

32.    While putatively awarded based on merit, in practice the Oscars are often awarded based on successfully lobbying the Academy's members, many of whom are based in Los Angeles.

33.    Weinstein was famously adept at such lobbying, and eventually became a member of the Academy himself.

34.    In a 2017 retrospective by *Forbes* magazine following Weinstein's expulsion from the Academy, the magazine wrote that Weinstein's Oscars were "often the result of aggressive campaigning," and a "key part of Weinstein's seemingly invincible persona." *Forbes* also wrote that such Oscars were "part of what made him so powerful that many women feared accusing him of abuses or gave in to his unwanted advanced."[1]

_____

[1] Madeline Berg, *After Expulsion From The Academy, Here Are All Of Harvey Weinstein's 81 Oscar Wins*, Forbes (Oct. 13, 2017, 4:35 PM), https://www.forbes.com/sites/maddieberg/2017/10/13/here-are-all-of-harvey-weinsteins-oscar-wins/.

35.   In the same piece, *Forbes* quoted film industry journalist Sasha Stone as stating, "Everyone knew if you were in a Harvey movie, chances are you were going to win or be nominated for an Oscar. . . . It's a sick thing to be in a business where that was the collateral used to coerce women."

### Weinstein Targets Loman

36.   Weinstein first met Emma Loman in 2004 at the Venice Film Festival, where they had a short conversation and exchanged contact information.

37.   Neither party contacted the other until 2006, when Weinstein called Loman to tell her that he had liked her work as an actor, and immediately invited her to be his guest at the upcoming Festival, a high-profile and prestigious annual film festival in Cannes, France—a major networking event for the film industry. Weinstein insisted on flying Loman to the Festival, putting her up in luxury hotel suite in the Hôtel Barrière Le Majestic for the duration of the Festival, and said that he wanted to personally discuss TWC projects in which he would like to cast Loman.

38.   While in most contexts such a call may be unusual, in the film industry, it was not. Part of the job of a film producer is "discovering" talented actors through viewing of their films, and then building a strong personal relationship. The hope, similar to "A&R men" from record companies or professional baseball scouts, is that once the actor becomes successful, the producer will be able to leverage that relationship to further profitable work with the producer on favorable terms, as the actor will feel a personal loyalty and debt to the producer.

39.   Still, Loman was initially hesitant at flying internationally to meet a man she barely knew, but was already in the process of planning to attend the Festival with a friend. She was well aware of Weinstein and his work, and he was both charming and persistent. At one point, Weinstein had his assistant

call Loman as many as 30 times a day. Finally, Loman—believing that she could not pass up such a professional opportunity—agreed to come to the Festival as a TWC guest.

40.   When Loman met with Weinstein at the Festival, she grew to believe that her hesitation had been foolish. Weinstein was very charming, and told her that he was very impressed with her work and believed in her as an actor. Weinstein encouraged her to call him if she ever needed professional advice. Weinstein further assuaged Loman by saying that his persistent behavior was for the sake of business, convincing her that she was as valuable an asset to him as he could be to her.

41.   Over the next several days, Loman had several further encounters with Weinstein at the Festival. Each time, he was highly professional and largely wanted to discuss Loman's work or the film industry.

42.   During one of these encounters, Weinstein said that he had several parts in upcoming TWC films that he thought Loman would be an excellent fit for. However, Weinstein said that he could only go into further detail in his "office," as the scripts were highly confidential.

43.   Weinstein's "office" in Cannes was a luxury hotel suite. However, this was not suspicious, as many executives at the Festival used suites in prestigious hotels for business as an indicator of status, wealth, and power. Meetings in such environments also further contributed to the informal vibe that the film industry often cultivated.

44.   Loman agreed to meet Weinstein in his hotel suite along with Weinstein's assistant.

### Weinstein Rapes Loman

45.   As planned, Loman met with Weinstein and his assistant to travel together to Weinstein's suite. The only way to reach said suite was via a private

elevator that only operated with a special key and led to the hotel's exclusive top floor.

46.   Once the three were in the elevator, Weinstein's assistant, claiming he had forgotten something necessary for the meeting, left just before the elevator doors closed, leaving Loman no opportunity to object.

47.   Suddenly left alone with Weinstein, Loman felt uncomfortable, but she trusted him due to their recent professional discussions—including an instance the day before in which Weinstein had introduced Loman to many of the most notable figures attending the Festival—and continued to her meeting with Weinstein. Loman's concerns were further diminished when an elderly couple later entered the elevator and shared a friendly conversation with Weinstein and Loman.

48.   Once alone with Loman in the suite, however, Weinstein's demeanor became drastically different.

49.   Weinstein prepared a Coca-Cola beverage for Loman out of her sight, and began to discuss her body. Weinstein made thinly-veiled attempts to coerce Loman into undressing, such as teasingly asking her if she was actually a man.

50.   Throughout these advances, Loman made it clear that she had no interest in engaging in anything other than business with Weinstein.

51.   Weinstein quickly became even more blunt, and told Loman that if she wanted to be in one of his films, she would have to be more comfortable with her body.

52.   Loman responded by expressing regret that she would not be able to work with Weinstein.

53.   Undeterred, Weinstein insisted on giving Loman a massage, and said that he would have serious trust issues working with her if she did not allow him to do so.

54.   Loman once again rebuffed Weinstein's advance, explicitly telling him that she did not consent and did not want him to touch her.

55.   At this point, while Loman was concerned and upset, she knew from her years of modeling work that many men would make inappropriate sexual comments in work settings, but would take it no further and usually stop once they saw that their advances would not be reciprocated.

56.   However, Weinstein attempted to give Loman a so-called massage after Loman explicitly and directly told him that she did not consent. At this point, Loman changed her strategy and attempted to dissuade Weinstein by redirecting the situation back to business, telling Weinstein that she could not take him seriously in a professional capacity if he continued behaving as he did.

57.   Weinstein responded by saying that he needed to get a script, and went into another room of his suite.

58.   Left alone, Loman was shaken and considered leaving the suite. Unfortunately, Loman was aware that women who attempted to walk out of meetings after experiencing such subjugation—especially from powerful men like Weinstein—faced both physical consequences in the immediate term, and economic, professional, and social consequences in the long term. Loman also considered the possibility that her rebuffs had seemed to work, and was eager to see Weinstein return to the friendly, professional figure he had been to her until a few moments ago.

59.   Loman's hope was magnified when Weinstein returned, with a script, and apologized for his previous actions. Unfortunately, her fear of

Weinstein's intent was not assuaged, as Weinstein had changed into a bathrobe. Still shaken and fearful, Loman tested her situation by telling Weinstein that she wanted to leave. Weinstein apologized some more, said that his assistant would return soon, and promised Loman that he would discuss the script he had brought.

60. Because she both feared retaliation if she tried to leave, and still had hope that Weinstein would keep his word, Loman stayed.

61. Weinstein, however, gradually returned to making thinly-veiled advances. He told Loman that he was stressed over a separate meeting and had to prepare with a shower to relax, and he proposed that Loman watch him shower so he could demonstrate to her how he is able to calm his mind.

62. Loman continued expressly refusing Weinstein's advances in the strongest possible terms.

63. Weinstein then quickly and unexpectedly escalated his behavior, and began touching and kissing Loman without her consent.

64. Loman immediately and repeatedly told Weinstein explicitly that she did not consent and asked him to stop, and continued repeating her objections throughout the remainder of Weinstein's assault.

65. However, Loman—a professional model who was three inches shorter and at least 100 pounds lighter than Weinstein—could not stop Weinstein, and did not know how to react to such a sudden shift in personality from a man she had trusted. Loman also feared what Weinstein would physically do to her if she screamed for help, and she knew that nobody would have heard her.

66. Weinstein then proceeded to rape Loman.

67. At one point during the rape, Weinstein bragged that he had recently received a negative result from an HIV test. Then, over Loman's continued

protests, he removed the condom he had been wearing and continued to rape Loman.

68.   Weinstein eventually finished, then forced Loman to shower with him before he allowed her to leave.

69.   Loman was shocked and traumatized by the encounter; she did not know how to react and did not know who she could speak to.

70.   Even more disorienting, Weinstein quickly went back to his formerly charming demeanor and acted like the entire rape had been a standard business meeting, as if he had engaged in the professional discussion that he had offered Loman instead of violently assaulting her. For example, Weinstein told Loman that one of his films was premiering at the Festival that evening, and that if she went, she could sit next to its director.

### Weinstein Threatens Loman

71.   On a later date, Weinstein invited Loman again to his hotel suite to discuss scripts.

72.   At first Loman balked, however she then doubted herself due to Weinstein's professional demeanor after the encounter. Weinstein repeatedly assured Loman that she would not be alone for this meeting, but it would be professionally organized and they would strictly discuss scripts. Weinstein's behavior caused Loman to question herself, and she wanted an explanation and an apology from Weinstein.

73.   Finally, Loman relented and agreed to meet with Weinstein a second time. She also believed that, knowing the risks, she would be able to escape the situation if Weinstein attempted to rape her a second time.

74.   When Weinstein's assistant escorted her again to Weinstein's top-floor hotel suite, Loman noticed that six security guards, seemingly armed, lined the walls of the long hallway from the elevator to Weinstein's suite.

75.   Although Weinstein's assistant left Loman as she entered the suite, she discovered that Weinstein had at least kept his promise that they would not be alone, as another woman was present in the room with Weinstein.

76.   However, Weinstein immediately made clear that he would not keep his promise to discuss business, and instead indicated that he wanted a threesome with Loman and the other woman.

77.   Loman, visibly distressed, immediately attempted to leave the hotel suite.

78.   Weinstein, however, quickly became physically aggressive.

79.   Weinstein rushed to the exit, physically blocking Loman from leaving and cornering her against a nearby wall. He then told Loman that his security guards would not allow her to leave, and that even if they did, she could not enter his elevator without its key.

80.   Loman, fearing another rape, began to shout and cry.

81.   Weinstein responded demanding that she stay in the suite until she appeared calm, stating that he would not allow her to leave until she promised to not tell or otherwise reveal to anyone what had happened.

82.   Weinstein then quickly changed tactics. He fell to his knees in front of Loman and began crying himself. He begged her to calm down, told her (for the first time) that he was engaged, and said that journalists were waiting downstairs who would ruin his marriage and career if they saw a distraught woman who had come from his suite.

83.   Weinstein's sudden and erratic change of tone only scared Loman even more, as she began to wonder what Weinstein was capable of. She made great effort to appear calm so that Weinstein would allow her to leave.

84.   Finally, after around an hour, Weinstein was satisfied that Loman had composed herself, and allowed her to leave his suite, escorted by his assistant.

85.   Sometime after this interaction, Weinstein called Loman to scream at her and berate her for what he apparently felt was unprofessional, objectionable behavior on her part.

86.   After the call, Weinstein ended any professional relationship with Loman and rescinded any outstanding invitations for events at the Festival. Loman was simply relieved that she would have no further dealings with Weinstein, and wished to put the experience behind her.

87.   Loman had further contact with Weinstein the following year, when she was in Los Angeles, to help shop a film to production companies in which she had been cast as the female lead. Loman was excited for the role, and had a close relationship with the film's planned director, producers, and cast.

88.   Weinstein contacted Loman and asked to speak with her in the Peninsula Beverly Hills Hotel. Since Loman was now in Los Angeles and in proximity to various personal and professional acquaintances, and because of their previous encounter, Loman felt somewhat confident that Weinstein would be unlikely to physically assault her again if she complied. Furthermore, because she was now in the nucleus of Weinstein's extraordinarily powerful network, Loman felt that declining to meet with Weinstein would endanger her safety and well-being more than complying with his request, and agreed to meet Weinstein with a friend.

89.   In this meeting, Weinstein behaved relatively professionally and calmly, and he took a copy of the script from Loman. Loman thought she had escaped unscathed.

90.   However, later that day, Weinstein's TWC purchased the script, and Loman was subsequently fired from the film.

91.   Loman was later told by multiple colleagues who had worked on the film that Weinstein had unilaterally ordered the firing himself, and told at least one producer not to do any business with Loman in the future—in what appeared to be an open threat to Loman that she not disclose Weinstein's rape and other misconduct to anyone.

## FIRST CAUSE OF ACTION

(Violation of Human Trafficking Laws, 18 U.S.C. § 1591(a))

92.   Plaintiff repeats and realleges the allegations made above as if fully set forth herein.

93.   Weinstein knowingly affected interstate commerce by recruiting, enticing, transporting, and soliciting Plaintiff, knowing that he would use threats of force, means of force, and coercion to make Plaintiff engage in commercial sex acts.

94.   Weinstein did so for the express purpose of forcing Plaintiff to engage in commercial sex acts, namely so that he could sexually assault and rape her in his hotel room in exchange for roles in prominent films and other professional opportunities.

95.   Weinstein, TWC, and Weinstein's assistant—who was acting on behalf of Weinstein—coordinated to form a venture that coerced, transported, and harbored Plaintiff, either with knowledge or in reckless disregard of the fact that Weinstein would use threats of force, means of force, and coercion to make Plaintiff engage in commercial sex acts.

96.   Weinstein's assistant financially benefitted from facilitating the transportation and harboring of Plaintiff, and he did so with knowledge or in

reckless disregard of the fact that Weinstein would use threats of force, means of force, and coercion to make Plaintiff engage in commercial sex acts.

97. Weinstein's assistant demonstrated his knowledge or reckless disregard of Weinstein's misconduct by transporting Plaintiff to a suite in which Weinstein attempted to engage in commercial sex acts.

98. TWC demonstrated its knowledge or reckless disregard of Weinstein's misconduct by stationing six guards outside of a suite in which Weinstein attempted to engage in commercial sex acts with the intent of controlling any admittance or departure from the suite.

99. At every stage of her interactions with Weinstein, TWC, and Weinstein's assistant, Plaintiff had a reasonable expectation of forming a productive and lucrative professional relationship with Weinstein and TWC.

100. Plaintiff had no expectation that this relationship would be conditional upon her engaging in commercial sex acts with Weinstein, or that she would be assaulted, raped, and falsely imprisoned.

101. Plaintiff suffered serious physical, mental, financial, and reputational harm as a result of Weinstein and the venture exploiting her and using means of force, including rape and sexual assault, to force Plaintiff to engage in commercial sex acts.

## SECOND CAUSE OF ACTION

(Assault)

102. Plaintiff repeats and realleges the allegations made above as if fully set forth herein.

103. Weinstein isolated Plaintiff in close quarters and prevented interference from bystanders; demanded and initiated sexual contact without Plaintiff's consent; raped Plaintiff; cornered, chased, and physically blocked Plaintiff to cause fear of physical harm; threatened harm to the career of

1  Plaintiff if she refused to participate in sexual activities; and potentially
2  exposed Plaintiff to sexually transmitted diseases without her consent.

3      104. Through these actions, Weinstein intended to cause apprehension of
4  harmful or offensive conduct, and did commit harmful and offensive conduct
5  against Plaintiff.

6                          **THIRD CAUSE OF ACTION**

7                                   (Battery)

8      105. Plaintiff repeats and realleges the allegations made above as if fully
9  set forth herein.

10      106. Weinstein engaged in unwanted contact with Plaintiff in a harmful
11  and offensive manner by forcibly causing sexual contact between Weinstein
12  and Plaintiff.

13      107. Weinstein's battery of Plaintiff caused physical, mental, and
14  emotional harm to Plaintiff.

15                        **FOURTH CAUSE OF ACTION**

16                              (False Imprisonment)

17      108. Without authority or justification, Weinstein held Plaintiff captive in
18  his hotel suite for nearly an hour.

19      109. Weinstein physically prevented Plaintiff from leaving, and told her
20  that she would not be able to leave unless she complied with his demands.

21      110. Through these actions, Weinstein caused Loman to reasonably fear
22  immediate physical harm.

23                           **PRAYER FOR RELIEF**

24      111. WHEREFORE, by reason of the foregoing, Plaintiff respectfully
25  requests that the Court enter judgment in Plaintiff's favor and against
26  Defendant, awarding:

27

28

A.   Compensatory damages in an amount to be determined at trial, in an amount no less than $75,000;

B.   Punitive damages for Plaintiff's state law claims of assault, battery, and false imprisonment in an amount to be determined at trial;

C.   Punitive damages pursuant to the civil remedy for human trafficking in 18 U.S.C. § 1595;

D.   Attorneys' fees pursuant to the civil remedy for human trafficking in 18 U.S.C. § 1595(a)

E.   Applicable interest on the foregoing amount;

F.   Declaratory relief; and

G.   Such other and further relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury for all issues so triable in this action.

Dated: August 20, 2018

**FERRUCCI LAW GROUP**

Joseph A. Ferrucci, Bar No. 186287
Attorneys for Plaintiff

**BALESTRIERE FARIELLO**

/S/

John G. Balestriere*
Matthew W. Schmidt, Bar No. 302776
*Attorneys for Plaintiff*
*Pro Hac Vice Application Forthcoming*

COMPLAINT