Joseph A. Ferrucci, Bar No. 246087
**FERRUCCI LAW GROUP**
24361 El Toro Road, Ste. 220
Laguna Woods, CA 92637
Telephone: (949) 600-5370
Facsimile:   (949) 500-5371
jferrucci@oc-litigation.com

John G. Balestriere*
Matthew W. Schmidt, Bar No. 302776
Peter S. Garnett**
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone: (212) 374-5421
Facsimile:   (212) 208-2613
matthew.schmidt@balestrierefariello.com
*Attorneys for Plaintiff*
*\*Admitted Pro Hac Vice*
*\*\*Pro Hac Vice Forthcoming*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| **EMMA LOMAN, an individual,** | No.: 2:18-cv-07310-CBM-KS |
| Plaintiff, | |
| – against – | **MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS** |
| **HARVEY WEINSTEIN, an individual,** | |
| Defendant. | |

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ....................................................................................5

ARGUMENT ......................................................................................................7

I.   LOMAN'S CLAIMS ARE TIMELY BECAUSE ANY STATUTES OF LIMITATIONS HAVE BEEN TOLLED BY THE DOCTRINES OF EQUITABLE ESTOPPEL AND EQUITABLE TOLLING ...........................7

    A.   Loman's Claims Are Timely Under the Doctrine of Equitable Estoppel Because She Feared Reprisal From Weinstein Through His Ongoing Threat of Physical Violence and Intimidation .....................8

    B.   Loman's Claims Are Timely Under the Doctrine of Equitable Tolling Because Weinstein's Ongoing Threat of Physical Harm and Intimidation Created an Extraordinary Circumstance that Prevented Loman from Filing Suit ........................................................10

    C.   Loman's Claims are Timely Under the Doctrine of Equitable Tolling Because the Injustice to Loman of Her Not Proceeding on Her Claims of Rape and Sexual Assault Outweighs Any Alleged Prejudice to Weinstein .............................................................................10

II.  LOMAN HAS ADEQUATELY PLEADED A TVPA CLAIM BECAUSE SHE PLEADED THAT A COMMERCIAL SEX ACT OCCURRED AND THAT WEINSTEIN KNOWINGLY ENTICED HER INTO THE COMMERCIAL SEX ACT ............................................................................11

    A.   Loman Has Adequately Pleaded a TVPA Claim Because She Pleaded a Commercial Component to Weinstein's Sexual Assault as Promises of Film Success Carry Value to an Aspiring Actress .........12

    B.   Loman Has Adequately Pleaded a TVPA Claim Because She Pleaded that Weinstein Knowingly Enticed Her Into Participating in a Commercial Sex Act .......................................................................13

III.   LOMAN'S COMMON LAW CLAIMS ARE SUBJECT TO THE ALIEN TORT STATUTE BECAUSE SHE PLEADED VIOLATIONS OF A CUSTOMARY LAW OF NATIONS.................................................................14

CONCLUSION .........................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*Addison v. State*,
 21 Cal.3d 313 (1978)................................................................11

*Bowoto v. Chevron Corp.*,
 557 F. Supp. 2d 1080 (N.D. Cal. 2008) .................................14

*Cervantes v. City of San Diego*,
 5 F.3d 1273 (9th Cir. 1993) .......................................................8

*Chang v. Biosuccess Biotech Co., Ltd.*,
 76 F. Supp. 3d 1022 (C.D. Cal. 2014) .....................................8

*Collins v. Gee West Seattle LLC*,
 631 F.3d 1001 (9th Cir. 2011) ...................................................9

*Doe I v. Nestle USA, Inc.*,
 766 F.3d 1013 (9th Cir. 2014) .................................................15

*Doe v. Bakersfield City Sch. Dist.*,
 136 Cal.App.4th 556 (Cal. Ct. App. 2006) .............................9

*In re Estate of Marcos Human Rights Litig.*,
 25 F.3d 1467 (9th Cir. 1994) ...................................................15

*John R. v. Oakland Unified Sch. Dist.*,
 48 Cal. 3d 438 (1989).............................................................8, 9

*Jones v. Blanas*,
 393 F.3d 918 (9th Cir. 2004) ...................................................11

*Juan Doe I v. Mahony*,
 No. CV 10-02902-JST (JEMx), 2011 WL 13127889 (C.D. Cal. Feb. 25, 2011)
 ...........................................................................................14, 15

*Kleinhammer v. City of Paso Robles*,
 No. SACV 06-0798-JFW (JTL), 2008 WL 11411472 (C.D. Cal. March 17, 2008)
 .......................................................................................................8

*Lantzy v. Centex Homes*,
    31 Cal.4th 363 (2003) ........................................................................8

*Manning v. Bunnell*,
    No. 2:12-cv-2440 MCE AC P., 2013 WL 2303231 (E.D. Cal. May 24, 2013) ......8

*McDonald v. Antelope Valley Cmty. Coll. Dist.*,
    45 Cal.4th 88 (2008) ......................................................................11

*McMahon v. Valenzuela*,
    No. 2:14-cv-02085-CAS(AGRx), 2015 WL 5680305 (C.D. Cal. Sep. 24, 2015)
    ...............................................................................................8, 10, 11

*Noble v. Weinstein*,
    335 F. Supp. 3d 504 (S.D.N.Y. 2018) ..........................................12, 13

*Ortega v. Pajaro Valley Unified School Dist.*,
    64 Cal. App. 4th 1023 (Cal. Ct. App. 1998) ......................................9

*Sarei v. Rio Tinto, PLC*,
    550 F.3d 822 (9th Cir. 2008) ...........................................................15

*Stoll v. Runyon*,
    165 F.3d 1238 (9th Cir. 1999) ........................................................10

*Ticer v. Young*, No. 16-cv-02198-KAW, 2018 WL 2088393 (N.D. Cal. May 4,
    2018)........................................................................................10

*Wong v. Beebe*,
    732 F.3d 1030 (9th Cir. 2013) ........................................................10

**Statutes**

18 U.S.C. § 1591 .................................................................................12

18 U.S.C. § 1595 ...................................................................................7

28 U.S.C. § 1350 .................................................................................14

Cal. Civ. Proc. § 340(c) ........................................................................7

Cal. Civ. Proc. §335.1 ...........................................................................7

1

## Other Authorities

2   *Rome Statute of the International Criminal Court,* art. 7 (g) (1998) ........................15

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **PRELIMINARY STATEMENT**

2      Plaintiff Emma Loman ("Loman") has adequately pleaded claims against

3 Defendant Harvey Weinstein ("Weinstein") for sex trafficking in violation of the

4 Trafficking Victims Protection Act ("TVPA") and for the common law claims of

5 assault, battery, and false imprisonment. These claims arose from Weinstein's

6 premeditated rape and sexual assault of Loman at the 2006 Cannes Film Festival

7 in France.

8      In 2004, Loman was an aspiring actress and successful model who met

9 Weinstein, a powerful film producer, at the Venice Film Festival. (Civil

10 Complaint for Damages, Dkt. No. 1 ("Compl.") ¶¶ 2–4.) In 2006, Weinstein

11 contacted Loman under the guise of discussing her acting career and the

12 possibility of appearing in one of Weinstein's films, arranging for the two to

13 meet at the 2006 Cannes Film Festival. (Compl. ¶¶ 4–10.) At Cannes, Weinstein

14 invited Loman to his hotel suite to have what he claimed were substantive

15 discussions about Loman's career. (Compl. ¶¶ 11, 12.) However, once in his

16 hotel suite, Weinstein raped and sexually assaulted Loman. (Compl. ¶¶ 13, 56,

17 63–68.)

18      After the rape occurred, at a later date, Weinstein again tried to get Loman

19 to participate in sex acts with him. (Compl. ¶ 76.) But this time, Loman resisted

20 and successfully refused Weinstein's advances. (Compl. ¶ 77.) In response,

21 Weinstein threatened her physical safety, while cornering her, and informed her

22 that his security guards would not allow her to leave unless she promised to

23 remain silent about Weinstein's rape and sexual assault of Loman. (Compl.

24 ¶ 16.) Out of her concern for her physical well-being, a fearful Loman agreed.

25 (*See* Compl. ¶¶ 74, 79–85.)

26      Weinstein's conduct intimidated Loman into the silence that Weinstein

27 wanted. (Compl. ¶ 18.) After the second attempted sexual assault, Weinstein

28

screamed at Loman and berated her. (Compl. ¶ 85.) The following year (2007), while Loman was in Los Angeles to shop a film in which she was cast, Weinstein asked to meet with Loman to ensure that Loman was aware of Weinstein's continuing influence in her industry. (Compl. ¶ 88.) Loman was afraid to decline the meeting because she continued to believe Weinstein would endanger her safety and her acting career. (*Id*.) Confirming Loman's fears, at the meeting, Weinstein took a copy of Loman's film script and later had his production company buy the film asserting his outside influence over Loman's career. (Compl. ¶¶ 89-90.) Loman was then promptly fired from the film. (Compl. ¶ 90.) Indeed, Loman later learned that Weinstein ordered her firing, and that Weinstein told at least one other producer not to work with Loman in the future. (Compl. ¶ 91.)

The physical threats of force and intimidation of Weinstein forced Loman into silence for years. It was only after more powerful actresses began to come forward in 2017 and Weinstein's influence waned significantly—he ended up losing his position at his own company and was reviled in Hollywood—that Loman finally felt safe coming forward to seek justice against a weakened Weinstein.

All of Loman's claims are timely under California law under the doctrines of equitable estoppel and equitable tolling.

Equitable estoppel applies to all of Loman's claims because Weinstein intentionally intimidated Loman by threatening her physical safety and then by taking actions to thwart Loman's film career. Not only was Weinstein physically intimidating when they met (he was 100 pounds heavier than her), Loman was well aware that Weinstein had his own security force (he posted six, apparently armed, security guards outside his Cannes hotel suite) that he could use to intimidate, and indeed did use to intimidate, Loman over time.    Loman

reasonably feared that if she revealed anything, Weinstein would not only destroy her career, but physically harm her as well.  Her fears proved at least partially justified when Weinstein purchased a film that Loman was set to be cast in seemingly solely to fire Loman from the picture. This fear caused Loman to reasonably fear for her safety if she filed suit against Weinstein, which at the time would have unearthed allegations that likely would have destroyed his career and marriage, leaving him with nothing to lose if he wished to seek revenge against Loman.

Equitable tolling also applies for two reasons and independently permits Loman's claims to proceed. First, the doctrine applies because Weinstein's wrongful conduct in threatening and intimidating Loman created an extraordinary circumstance that prevented Loman from filing suit. Loman was terrified by Weinstein's threats of physical violence and by the prospect of Weinstein taking further steps to ruin her acting career. Second, the doctrine of equitable tolling applies because tolling the statutes of limitations here is in the interests of justice. The doctrine requires that this Court balance the injustice to the plaintiff in not being able to bring her lawsuit against the policy goals of statutes of limitations.

Here, the injustice to Loman of not being able to seek redress for the life altering crime of rape far outweighs the policy goals of the limitation laws as applied to Weinstein. Such policy goal of limitations is to bring finality to settled events and to protect a defendant from not being able to defend himself due to old or lost evidence. But the policy goals of the statutes of limitations in fact favor the tolling of Loman's claims: Weinstein has not highlighted any prejudice he will suffer by these claims going forward other than his stated inability to find unnamed individuals he claims are witnesses. Weinstein identifies his assistant, the security guards, and other film makers as potential witnesses (who

1  supposedly were present immediately before and after Weinstein raped Loman,
2  or were present in the days before and after the rape). (Defendant Harvey
3  Weinstein's Memorandum in Support of Motion to Dismiss Plaintiff's
4  Complaint, Dkt. No. 28-1 (the "Motion"), 14.) But not even Weinstein claims that
5  any of these individuals actually observed Weinstein raping and assaulting
6  Loman. The policy interest in allowing Loman's claims to go forward outweighs
7  any prejudice Weinstein claims he may suffer.

8       Loman has adequately pleaded a claim under the TVPA. Loman has
9  sufficiently pleaded that Weinstein engaged in a commercial sex act as required
10 by the TVPA. Indeed, courts have held that, as here, the promise or expectation
11 of a film role, which Weinstein offered Loman, is enough to constitute the
12 commercial aspect of a TVPA claim. Loman has also pleaded that she was
13 enticed into the situation that resulted in her rape. Again, Weinstein's promises
14 of acting success were enough to arouse Loman's hopes and desires to succeed
15 in the film industry, which in turn enticed her to meet with Weinstein.

16      Loman's common law tort claims of assault, battery, and false
17 imprisonment may proceed here as they are subject to the Alien Tort Statute,
18 which allows the claims to be heard by courts in the United States even though
19 the rape and sexual assault of Loman took place in France. The Alien Tort Statute
20 applies because Loman has pleaded a violation of law—rape and sexual
21 assault—that is understood by the courts of this District to be a customary law
22 in the international community.

23      Loman's claims against Weinstein should be allowed to proceed because
24 the doctrines of equitable estoppel and equitable tolling apply to all of Loman's
25 claims. Weinstein's physical and career threats to Loman prevented and
26 intimidated her from coming forward until she reasonably believed it was safe
27 to do so. Loman has adequately pleaded all the required elements of a TVPA
28

claim and all of Loman's common law claims are subject to the Alien Tort Statute, giving this Court jurisdiction to hear all of Loman's claims. This action should proceed into discovery to be resolved on the merits.

## STATEMENT OF FACTS

Loman—an actor, producer, and model—first met Weinstein in 2004 at the Venice Film Festival. (Compl. ¶¶ 24, 36.) Weinstein took Loman's contact information, but the two did not meet again until 2006., when Weinstein invited her to the Cannes Film Festival (Compl. ¶¶ 36–37.) Weinstein insisted on flying Loman to Cannes and paying for hotel accommodations. (Compl. ¶ 37.) Importantly to a young actor, Weinstein said he wanted to discuss her career and potential roles in Weinstein film productions, and even that he had a role in mind for her. (Compl. ¶ 38.) Loman was hesitant to attend because she did not personally know Weinstein. (Compl. ¶ 39.) But Weinstein was persistent and Loman, believing she could not pass up this professional opportunity, agreed to come to Cannes as Weinstein's guest. (*Id.*)

Once Loman arrived in Cannes, Weinstein invited Loman to his personal hotel suite (what Weinstein called his "office") to discuss scripts and film projects. (Compl. ¶¶ 42–44.) Loman accepted the invitation because many film executives used hotel suites at the festival to discuss business and show their status, wealth, and power. (Compl. ¶¶ 43–44.)

On the day of the meeting, Loman was escorted by Weinstein and his personal assistant by private elevator to Weinstein's suite. (Compl. ¶ 45.) But almost immediately, Weinstein's assistant left, leaving Loman and Weinstein alone in his suite. (Compl. ¶ 46.) Loman felt uncomfortable, but she knew how important this meeting could be to her film career. (Compl. ¶ 47.) At that point, Weinstein's professional demeanor changed, and he began making sexually charged statements to Loman. (Compl. ¶¶ 48-49.) Loman made clear that she

only wanted to discuss business, but Weinstein persisted in making lewd statements and insisted that he give Loman a massage. (Compl. ¶¶ 50–51, 53.) Loman, again, rebuffed Weinstein's advances, but Weinstein began to touch Loman against her will. (Compl. ¶ 56.) Loman explicitly told Weinstein that she did not consent. (*Id*.) She remained in the suite because she knew how important this meeting was to her career, and she believed she could get Weinstein to get back to the charming, business-oriented person she thought she knew. (Compl. ¶ 58.) But Weinstein persisted with his sexual behavior by changing into a bathrobe and asking Loman if she would like to watch him shower. (Compl. ¶¶ 59, 61.) After Loman again rebuffed Weinstein, he began to touch and kiss Loman without her consent. (Compl. ¶¶ 62–64.) She was unable to stop Weinstein, who was at least 100 pounds heavier and three inches taller than Loman. (Compl. ¶ 65.) Weinstein then proceeded to rape Loman. (Compl. ¶ 66.)

After Weinstein allowed Loman to leave when he finished raping her, she was shocked and traumatized. (Compl. ¶ 68–69.) On a later date, Weinstein invited Loman back to his suite to discuss scripts. (Compl. ¶ 71.) Even though she was still shocked and terrified by the rape, she agreed to accompany Weinstein on the condition that she would not be alone with him. (Compl. ¶¶ 72–73.) This time, Loman noticed that Weinstein had several armed security guards near his suite. (Compl. ¶ 74.) Once she arrived in the suite, Weinstein made clear he would not be discussing business and he indicated that he wanted to have a threesome with Loman and another woman in the suite. (Compl. ¶¶ 75–76.) Loman attempted to leave but Weinstein became physically aggressive, blocking her from exiting the suite and cornering her against the wall, holding her against her will for about an hour. (Compl. ¶¶ 78–79, 84.) Loman began to shout and cry, as she feared another rape. (Compl. ¶ 80.) Weinstein eventually let her leave but later called Loman to scream and berate

her for not having sex with him at their last meeting. (Compl. ¶ 84–85.) After the second incident, Weinstein rescinded all of his invitations to Cannes events with Loman. (Compl. ¶ 86.)

The following year, when Loman was in Los Angeles to shop a film she was set to star in, Weinstein contacted Loman to meet again. (Compl. ¶¶ 87–88.) Loman complied with Weinstein's request because she was still terrified of Weinstein physically hurting her or ruining her career. (Compl. ¶ 88). At first, Loman felt relieved because Weinstein acted professionally and took a copy of Loman's script. (Compl. ¶ 89.) However, later that day Loman learned that Weinstein purchased the rights to the script. (Compl. ¶ 90.) Loman was then abruptly fired from the film. (*Id*.) She later learned that Weinstein had ordered the firing. (Compl. ¶ 91.) She also learned that Weinstein warned at least one other producer to not do any business with Loman. (*Id*.) Loman understood these actions as an open threat to her so that she would not disclose Weinstein's actions in Cannes and in Los Angeles. (*Id*.) Loman was dissuaded from coming forward and seeking redress against Weinstein for years because of Weinstein's threats and intimidation. (See *Id*.)

## **<u>ARGUMENT</u>**
### **I.   LOMAN'S CLAIMS ARE TIMELY BECAUSE ANY STATUTES OF LIMITATIONS HAVE BEEN TOLLED BY THE DOCTRINES OF EQUITABLE ESTOPPEL AND EQUITABLE TOLLING**

Loman's claims are timely due to both the doctrines of equitable estoppel and equitable tolling because she reasonably feared reprisal from Weinstein if she brought suit, and because justice demands tolling of the limitations statutes. The limitations period for a claim under the TVPA (ten years); for assault (two years); for battery (two years); and for false imprisonment (one year) all may be tolled under the doctrines of equitable estoppel or equitable tolling. 18 U.S.C. § 1595(c); Cal. Civ. Proc. §335.1; Cal. Civ. Proc. § 340(c). Both doctrines apply, such

1  that all of Loman's claims are timely and may proceed and Weinstein's Motion
2  must be denied.

3      The Motion also must be denied because, as the Ninth Circuit has
4  recognized, California's equitable tolling doctrines are "fact-intensive" inquiries
5  that are "more appropriately applied at the summary judgment or trial stage of
6  litigation." *Cervantes v. City of San Diego*, 5 F.3d 1273, 1276 (9th Cir. 1993)
7  (characterizing as "unusual" situation where equitable tolling may be resolved
8  on motion to dismiss); *see Kleinhammer v. City of Paso Robles*, No. SACV 06-0798-
9  JFW (JTL), 2008 WL 11411472, at *8 (C.D. Cal. March 17, 2008) ("the Ninth Circuit
10  has stressed that California's fact-intensive test for equitable tolling is more
11  appropriately applied at the summary judgment stage of litigation, and that it
12  is the unusual case in which a court can conclude from the face of the complaint
13  that, as a matter of law, plaintiff cannot show equitable tolling"), *adopted by* No.
14  CV 06-0798-JFW (JTL), 2008 WL 11411425 (C.D. Cal. Mar. 17, 2008). The Motion
15  should be denied and, at a minimum, the validity of Loman's claims of equitable
16  estoppel and equitable tolling should be determined at a later stage.

17      **A. Loman's Claims Are Timely Under the Doctrine of Equitable
18          Estoppel Because She Feared Reprisal From Weinstein
19          Through His Ongoing Threat of Physical Violence and
            Intimidation**

20      The statutes of limitations for Loman's claims are tolled by the doctrine of
21  equitable estoppel because she feared reprisal from Weinstein if she brought
22  suit. Under California law, equitable estoppel acts to estop a defendant from
23  asserting a statute of limitations defense where the defendant's own conduct
24  prevented the defendant from bringing suit. *See Chang v. Biosuccess Biotech Co.,
25  Ltd.*, 76 F. Supp. 3d 1022, 1053 (C.D. Cal. 2014) (citing *Lantzy v. Centex Homes*, 31
26  Cal.4th 363, 383 (2003)); *Manning v. Bunnell*, No. 2:12-cv-2440 MCE AC P., 2013
27  WL 2303231, at *3 (E.D. Cal. May 24, 2013) (a party "should not be allowed to
28

benefit from its own wrongdoing") (quoting *Collins v. Gee West Seattle LLC*, 631 F.3d 1001, 1004 (9th Cir. 2011)).

Equitable estoppel is "certainly" appropriate where a defendant engaged in acts of "violence or intimidation" that were "intended to prevent the filing of a claim." *McMahon v. Valenzuela,* No. 2:14-cv-02085-CAS(AGRx), 2015 WL 5680305, at *12 (C.D. Cal. Sep. 24, 2015) (citing *John R. v. Oakland Unified Sch. Dist.*, 48 Cal. 3d 438, 445 (1989) (applying equitable estoppel where teacher's threats of retaliation prevented sexually abused student from pursuing claims)); *see also Doe v. Bakersfield City Sch. Dist.*, 136 Cal.App.4th 556, 571-3 (Cal. Ct. App. 2006) (teacher's threats and plaintiff's fear, even into adulthood, necessitated application of equitable estoppel); *Ortega v. Pajaro Valley Unified School Dist.*, 64 Cal. App. 4th 1023, 1050 (Cal. Ct. App. 1998) (teacher's continuous verbal threats and intimidating conduct supported application of the equitable estoppel doctrine). Such tolling applies until the *effects* of the intimidation has ceased. *McMahon,* 2015 WL 5680305 at *13. This doctrine applies here.

Indeed, Weinstein intentionally intimidated Loman by making physical threats that prevented her from bringing suit. (Compl. ¶¶ 65, 74, 78–79, 85.) Weinstein's actions included physically preventing her from leaving his hotel suite, and posting armed security guards outside his suite for no reasonable purpose except intimidation. (*See* Compl. ¶¶ 16, 74.)

Loman reasonably feared physical harm to her if she acted against Weinstein, a hugely powerful figure who had shown a willingness to harm her physically (including by raping her), and carefully cultivated a reputation in the industry of being willing to resort to physical violence. (*See, e.g,* Compl. ¶¶ 58, 65, 78.) Weinstein later even bought a script simply to fire Loman from a film in order to signal to her that those threats still stood. (Compl. ¶¶ 90–91.) Loman's

claims should be properly equitably estopped as Loman reasonably feared physical harm from Weinstein if she brought suit.

### B. Loman's Claims Are Timely Under the Doctrine of Equitable Tolling Because Weinstein's Ongoing Threat of Physical Harm and Intimidation Created an Extraordinary Circumstance that Prevented Loman from Filing Suit

Loman's claims are also properly tolled under the doctrine of equitable tolling. The elements of equitable tolling are that (1) the plaintiff pursued her rights diligently and (2) an extraordinary circumstance stood in her way. *Ticer v. Young*, No. 16-cv-02198-KAW, 2018 WL 2088393, at *7 (N.D. Cal. May 4, 2018) (citing *Wong v. Beebe*, 732 F.3d 1030, 1052 (9th Cir. 2013)).

The first element (diligent pursuit of the claim) is satisfied so long as the plaintiff acts as diligently as a reasonable person under her particular circumstances. *Ticer*, 2018 WL 2088393, at *7. The second element (existence of extraordinary circumstances) is satisfied where "wrongful conduct" by a defendant delays a plaintiff's filing of her claim. *Stoll v. Runyon*, 165 F.3d 1238, 1242 (9th Cir. 1999) (equitably tolling limitations period where plaintiff "impaired" by rape and sexual assault); *see Ticer*, 2018 WL 2088393, at *7.

Loman's claims are subject to equitable tolling because Weinstein's physical threats prevented her from filing suit within the limitations period. A reasonable person exercising diligence in her situation would not have taken any further steps our of fear of Weinstein's reprisal. Loman's claims are timely because they are equitably tolled.

### C. Loman's Claims are Timely Under the Doctrine of Equitable Tolling Because the Injustice to Loman of Her Not Proceeding on Her Claims of Rape and Sexual Assault Outweighs Any Alleged Prejudice to Weinstein

Loman's claims are also equitably tolled because the injustice she would suffer due to the barring of her claims outweighs any prejudice to Weinstein.

California courts apply equitable tolling to "soften the harsh impact of technical rules" in the interests of fairness where the injustice to a plaintiff in being unable to bring a claim outweighs the prejudice to the defendant. *Jones v. Blanas*, 393 F.3d 918, 928 (9th Cir. 2004) (district court erred in failing to apply equitable tolling because movant was civilly confined and unable to file suit within the limitations period). Thus, California courts will equitably toll a statute of limitations where "justice demands it." *McMahon*, 2015 WL 5680305, at *12 (quoting *McDonald v. Antelope Valley Cmty. Coll. Dist.*, 45 Cal.4th 88, 99–100 (2008)). Accordingly, the doctrine turns on a "'balancing'" of the "injustice" to the plaintiff against policy goals of the limitations statute. *McMahon*, 2015 WL 5680305, at *12 (quoting *Addison v. State*, 21 Cal.3d 313, 321 (1978)).

First, the injustice to Loman far outweighs the prejudice to Weinstein. Loman was threatened and intimidated into not filing her claims in a timely fashion. The rape and sexual assault of Loman demands that equitable tolling be applied to this case. Second, Weinstein is not prejudiced by the tolling of these claims. Weinstein has not pointed to any prejudice except the loss of his ability to identify witnesses. But none of the potential witnesses he raises (his assistant, security guards, or filmmakers present at the festival) were even alleged to be present during the rape and assault at issue. The demands of justice require that the statutes of limitations are tolled as to all of Loman's claims.

## II. LOMAN HAS ADEQUATELY PLEADED A TVPA CLAIM BECAUSE SHE PLEADED THAT A COMMERCIAL SEX ACT OCCURRED AND THAT WEINSTEIN KNOWINGLY ENTICED HER INTO THE COMMERCIAL SEX ACT

Loman has adequately pleaded her TVPA claim. Under the TVPA, in order to state a claim, a plaintiff must adequately plead that the defendant knowingly and in interstate or foreign commerce "(1) recruited, enticed, harbored, transported, provided, obtained, or maintained by any means a

1 | person; (2) 'knowing, or in reckless disregard of the fact, that means of force,
2 | threats of force . . . or any combination of such means will be used'; (3) 'to cause
3 | the person to engage in a commercial sex act.'" *Noble v. Weinstein,* 335 F. Supp.
4 | 3d 504, 515 (S.D.N.Y. 2018) (quoting 18 U.S.C. § 1591). Here, Loman has
5 | adequately pleaded that Weinstein enticed her into committing a commercial
6 | sex act.

> ### A. Loman Has Adequately Pleaded a TVPA Claim Because She Pleaded a Commercial Component to Weinstein's Sexual Assault as Promises of Film Success Carry Value to an Aspiring Actress

Loman has adequately pleaded her sex trafficking claims because she pleaded a "commercial" component to Weinstein's sexual assault. Under the TVPA, a "[c]ommercial sex act" is defined as "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3). In *Noble v. Weinstein*, the court explained that to an aspiring actress, meeting a person like Weinstein "carries value, in and of itself." *Noble*, 335 F. Supp. 3d 521. Even though the victim was not given something tangible, "the expectation of a film role, of a modeling meeting" were things of value to the victim. *Id*. "[T]he reasonable expectation of receiving those things in the future, based on [Weinstein's] repeated representations that she would, is sufficient." *Id*. Notwithstanding Weinstein's claim that the TVPA requires an explicit quid pro quo promise, nothing in *Noble* even suggests such a requirement. *Compare* Motion 9:12–18, *with Noble*, 335 F. Supp. 3d 515. As Loman pleaded, there was, like in *Noble*, a clear understanding between Weinstein and Loman was offering a thing of value (lucrative film roles, also as in *Noble*) if she visited his hotel suite. (Compl. ¶¶ 40–42, 50–51.) Nothing in *Noble* supports Weinstein's logic that a defendant may avoid TVPA liability simply by being coy, when all parties understand the interaction as a commercial one.

1   The same reasoning in *Noble* applies here. Weinstein told Loman that he
2   had several parts for which Loman would be perfect for and enticed Loman to
3   come to his "office" to discuss the highly confidential scripts. (Compl. ¶ 42.)
4   Once Weinstein got Loman into his "office" (actually his luxury hotel suite in
5   Cannes), he proceeded to sexually assault and rape Loman. (Compl. ¶¶ 43, 53–
6   54, 56, 61–66.) As such, Loman adequately pleaded her TVPA claim because she
7   has pleaded a commercial component to Weinstein's rape and sexual assault.

8   ### B. Loman Has Adequately Pleaded a TVPA Claim Because She
9   ###    Pleaded that Weinstein Knowingly Enticed Her Into
10  ###    Participating in a Commercial Sex Act

11  Loman's TVPA claim is adequately pleaded because she pleaded that
12  Weinstein knowingly enticed her to engage in a commercial sex act. While word
13  "entices" was not defined by Congress when the TVPA was drafted, the *Noble*
14  court drew on definitions from widely-accepted dictionaries to define the term
15  as "to attract artfully or adroitly or by arousing hope or desire." *Noble*, 335 F.
16  Supp. 3d 517. As the *Noble* court also recognized, even empty promises of film
17  stardom and success are more than enough to entice an aspiring actor and to
18  arouse the "hope and desire" necessary to plead the TVPA element of
19  enticement. *Id*.

20  Like the victim in *Noble*, Loman was enticed by the claims that Weinstein
21  was interested in her career and that Weinstein wanted to cast Loman in
22  Weinstein's projects. (Compl. ¶ 37.) Loman was hopeful that Weinstein could
23  propel her film career. Weinstein encouraged Loman to call him so that he could
24  give her professional advice. (Compl. ¶ 40.) Weinstein even told Loman that he
25  wanted discuss Loman's work or the film industry in general. (Compl. ¶ 41.)
26  Weinstein then said that he had several parts in upcoming films that he thought
27  Loman could act in. (Compl. ¶ 42.) Although Weinstein's interest in Loman's

28

career turned out to only be a ploy to rape and sexually assault her, Loman was enticed into believing that these claims were true. In the end, Weinstein's played at Loman's hopes and desires to succeed in the film industry to facilitate her being a part of a commercial sex act that violated the TVPA.

Loman has adequately pleaded her TVPA claim because she pleaded that Weinstein knowingly enticed her into committing a commercial sex act.

## III. LOMAN'S COMMON LAW CLAIMS ARE SUBJECT TO THE ALIEN TORT STATUTE BECAUSE SHE PLEADED VIOLATIONS OF A CUSTOMARY LAW OF NATIONS

Loman's claims are subject to the Alien Tort Statute ("ATS") because she has pleaded an action committed in violation of the law of nations—rape. The ATS holds that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. To plead an ATS claim and give the district court jurisdiction, there must be "a (1) tort claim, (2) filed by an alien, that (3) alleges a violation of the law of nations or a treaty of the United States." *Juan Doe I v. Mahony*, No. CV 10-02902-JST (JEMx), 2011 WL 13127889, at *3 (C.D. Cal. Feb. 25, 2011) (district court had subject matter jurisdiction as the ATS applied to plaintiff's claims of rape and sexual abuse). As such, "[c]ourts have consistently permitted the extraterritorial application of the ATS to non-U.S. nationals, provided the claims are brought under a sufficiently definite and universal norm of international law." *Bowoto v. Chevron Corp.*, 557 F. Supp. 2d 1080, 1088 (N.D. Cal. 2008) (ATS only applicable if the party alleges "a violation of a definite and accepted norm of international law").

However, "[n]ot all violations of international law are actionable under the ATS . . . [as] a party must allege a violation of a definite and accepted norm of international law." *Bowoto*, 557 F. Supp. 2d 1089. The test is whether a

"contemporary international legal norm underlying a proposed ATS claim is 'specific, universal, and obligatory.'" *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013, 1019 (9th Cir. 2014) (quoting *In re Estate of Marcos Human Rights Litig.*, 25 F.3d 1467, 1475 (9th Cir. 1994)). Courts will look to the "customary international law" that consists of "rules that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern." *Doe I*, 766 F.3d at 1019.

Courts have found that "rape and sexual abuse" is "an actionable offense under the ATS as a crime against humanity." *Juan Doe I*, 2011 WL 13127889, at *7; *see also Rome Statute of the International Criminal Court*, art. 7 (g) (1998) (listing rape as a crime against humanity). Additionally, the plaintiff does not have to exhaust the availability of local remedies before filing an ATS claim. *Sarei v. Rio Tinto, PLC*, 550 F.3d 822, 824 (9th Cir. 2008) (judicially-imposed or prudential exhaustion is not a prerequisite to the exercise of jurisdiction).

Loman's common law claims are subject to the ATS because she has pleaded a crime—rape—that is internationally accepted as a crime that is in violation of the law of nations. Even though the incident occurred in France, this Court has jurisdiction because Loman has pleaded all of the elements of an ATS claim. She has pleaded a tort claim, filed by an alien, which alleges a violation of the laws of nations. Loman was brutally raped by Weinstein. (Compl. ¶¶ 67-68.) The crime of rape is so base and violating that it is an internationally recognized crime. Thus, Loman's common law claims against Weinstein give this Court jurisdiction to hear the claims under the ATS.

## **CONCLUSION**

Weinstein brutally raped and sexually assaulted Loman. Despite these horrendous actions taking place outside the United States and not within the applicable statutes of limitation, Loman's claims should be allowed to progress because the doctrines of equitable estoppel and equitable tolling apply to these

claims. Loman's claims are also properly before this Court because the ATS dictates it. Thus, for the reasons set forth above, the Court should deny Weinstein's motion to dismiss.

Dated: April 22, 2019

By: */s/Joseph A. Ferruci*
Joseph A. Ferrucci, Bar No. 246087
**FERRUCCI LAW GROUP**
24361 El Toro Road, Ste. 220
Laguna Woods, CA 92637
Telephone: (949) 600-5370
Facsimile:   (949) 500-5371
jferrucci@oc-litigation.com